1  **BAHIG SALIBA**

2  10824 East Santa Fe Trail

3  Scottsdale, AZ 85262

4  Ph: 480-235-0304

5  Email: medoverlook@protonmail.com

6

7

8  ## IN THE UNITED STATES DISTRICT COURT

9  ## FOR THE DISTRICT OF ARIZONA

10

11  **BAHIG SALIBA,**

12  **Plaintiff,**

13  v.                          CASE No.   CV-22-738-PHX-DLR

14  **AMERICAN AIRLINES, Inc.;**   COMPLAINT AND JURY DEMAND

15  **CHIP LONG, Sr. VP of Flight;**

16  and

17  **TIMOTHY RAYNOR, Dir. of**

18  **Flight.**

19  **Defendants,**

20

21

22

23      COMES NOW plaintiff, *Pro Se,* Bahig Saliba, an airline captain in the employ of American

24  Airlines, Inc. (AA) and files this complaint against his employer and against Chip Long acting as

25  Senior Vice President of Flight and Timothy Raynor acting as Director of Flight (defendants). The

26  plaintiff alleges that the defendants created and implemented a company mask policy that directly

27  violated aviation law, superseded the Federal Aviation Administration (FAA) Federal Aviation

Complaint

1   Regulations (FARs), dispatched flights illegally, and placed pilots, flight attendants and passengers
2   alike in grave danger.

3

4       The plaintiff alleges that in implementing said policies, the defendants employed coercion,
5   intimidation and threats, and violated a contract in existence between the plaintiff and AA.  By
6   their actions, the defendants created a hostile work environment, defamed and attacked the
7   plaintiff's character, disadvantaged him financially and placed him in an untenable position that is
8   one step from termination.

9

10      Intent on causing maximum permanent and irreparable harm to the plaintiff, in retaliation,
11  and in spite of the April 18th, 2022, order issued by the Honorable Katheryn Kimball Mizelle in
12  the United States District Court, Middle District of Florida, Tampa Division, declaring the mask
13  mandate unlawful and ordered to be vacated, the defendants demanded on April 22nd, 2022, an AA
14  assessment of the plaintiff's "fitness for duty," a determination reserved for pilots themselves
15  under the law, in violation of the Joint Collective Bargaining Agreement (JCBA) between the
16  Allied Pilots Association (APA) and AA.

17

18

19                              **JURISDICTION AND VENUE**

20

21      The plaintiff is a Federally Certified Flight officer (pilot or airman, used here
22  interchangeably) by the FAA who has been in the employ of AA for the last 24 years.  The plaintiff
23  has been based at AA's Phoenix Sky Harbor International Airport hub for the duration of his
24  employment.  The plaintiff resides in Scottsdale, Arizona and conducts all his flying for the airline
25  which begins and ends at the Phoenix Sky Harbor International Airport (KPHX).  KPHX is one of
26  hundreds of airports in the United States that operate under Title 49 of the U.S. Code that is served
27  by and is a hub for AA.

28

Complaint

1        The plaintiff received many pilot certificates since starting his flying career in August of

2    1984 and he is bound by and must comply with all the FARs.  In addition, for a pilot to exercise

3    the privileges of a pilot certificate, and in accordance with 14 CFR Part 61.2 (FAR § 61.2[1]), a pilot

4    must continually receive a valid medical certificate issued to him by an FAA Aeromedical

5    Examiner (AME) by following strict guidelines that are well established by the FAA.

6

7        AA is an airline engaged in interstate and international commerce that is subject to Title

8    49 of the U.S. Code.  The home office of AA is in Fort Worth, Texas, and AA maintains presence

9    in Phoenix, Arizona.  The FAA is a branch of the Department of Transportation (DOT) that

10   regulates the operations of the airline primarily under 14 CFR Part 121.  AA is subject to the same

11   rules and regulation as the plaintiff and is bound by and must comply with all FAA rules and

12   regulations.

13

14        The remaining defendants, who must also comply with all the FARs, are Captain Chip

15   Long, Senior Vice President of Flight Operations who is based at the airline headquarters in Fort

16   Worth, Texas, and Captain Timothy Raynor, Director of Flight Chicago and Phoenix who is based

17   in AA's Chicago Hub.

18

19       This court has subject matter jurisdiction under 28 U.S. Code § 1331 because this action

20   arises under Federal Law, namely 49 U.S. Code and 14 CFR, and 42 U.S. Code § 1983.  It is the

21   proper venue because all damages occurred to the plaintiff in the State of Arizona.

22

23        This court has personal jurisdiction because AA maintains a base in Phoenix, Arizona and

24   defendants conduct business and maintain contacts with the forum as Vice President of Operations

25   and Director of Flight.

26

27

---

[1] FAR § 61.2 (b) **Currency**.  No person may: (1) Exercise privileges of an airman certificate, rating, endorsement, or authorization issued under this part unless that person meets the appropriate airman and medical recency requirements of this part, specific to the operation or activity.

Complaint

# FACTUAL BACKGROUND

The plaintiff began his flying career in mid 1984. He obtained many pilot certificates and ratings[2] including a flight instructor certificate in airplanes and helicopters. In addition, he holds a flight engineer certificate and has held many positions as an instructor and a pilot with various airlines before joining America West Airlines (AWA) in the summer of 1997.

Directly prior to joining AWA, the plaintiff held an instructor position at McDonnel Douglas aircraft manufacture in Long Beach California. To date, he has an impeccable aviation career spanning 37 years. Not once during his 24-year employment with AA did he perform any task unsatisfactorily, had any incident or accident or even had any report of conflict with any other colleague.

As a pilot, the plaintiff struck an agreement with AWA which constituted his employment contract with the airline. In simple terms, the plaintiff agreed to provid his product and services for a consideration. The product that the plaintiff provided and agreed to keep current for the duration and until mandatory retirement age is a valid medical certificate issued to him by the FAA. The plaintiff has the duty and is ethically responsible to uphold his end of the bargain in compliance with the contract and for the safety and security of his crew and passengers. The plaintiff knows the seriousness of what he is engaged in and the consequences of any lapses in safety or readiness to operate aircraft.

The FAA is the only federal agency that has jurisdiction over the issuance of such medical certificate, and only the plaintiff has the full authority vested in him by the FAA in making the day-to-day and even hourly decisions relating to the validity of his medical certificate and his readiness and fitness for duty, to safely execute his flight assignment.

---

[2] *Rating* means a statement that, as part of a certificate, sets forth special conditions, privileges, or limitations.

Complaint

Over time and through mergers and acquisitions, AWA grew and became what is today the largest airline operating under the AA name. The plaintiff's contract with AWA has been inherited and now lives in the halls of AA and is managed by the APA, the pilot union representing the pilots in the service of AA, through the JCBA that was struck between AA and the APA.

Pilots embark on a career path that is structured in a manner that disallows transfer from one airline to another without financial hardship. Pilots work their way within a seniority system which, once invested in, becomes more lucrative. In short, working at an airline and maintaining a valid FAA issued medical certificate is a lifelong commitment that pilots cherish, albeit the plaintiff alleges that in this case it has become a tool for coercion and intimidation by the defendants.

# AIRMEN MEDICAL CERTIFICATION

As outlined in FAR § 61.2, airmen are required by law and FAA regulations to go through a medical examination and receive a valid medical certificate in order to exercise the privileges of their airman certificate. As a captain for AA, the plaintiff must receive a medical examination every six months and once a year receive an electrocardiogram (EKG). After a successful medical examination, the plaintiff is issued a First-class medical certificate indicating he has met the rigorous medical standards established by the FAA Aeromedical department. Those standards have been established and listed under 14 CFR Part 67 of the code. The physicians conducting such examination are authorized by the FAA to issue medical certificates and are referred to in the industry as AMEs.

The FAA publishes a guide titled Aeromedical Guide for AMEs (AME Guide). The AME Guide outlines acceptable procedures and rules for conducting a physical examination. The applicant, an airman, must meet the standards established under 14 CFR Part 67 for the medical certificate sought to be issued by the AME. Neither the AME Guide nor 14 CFR Part 67 have

Complaint

been amended to contain guidance or reference to the use of facial masks. The FAA has not issued any such exemption to the applicable standards required for the issuance of medical certificates allowing the use of facial masks by pilots. The plaintiff received such examination on 3/28/2022 by Dr. Ross Burr and was issued a valid medical certificate.

# AME GUIDE STATEMENT

Within the AME Guide on page eight resides the following paragraph:

*"Whoever in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact, or who makes any false, fictitious or fraudulent statements or representations, or entry, may be fined up to $250,000 or imprisoned not more than 5 years, or both (Title 18 U.S. Code Secs. 1001; 3572)."*

Safety in aviation is paramount and the statement above is to be considered seriously. Aviators must abide by the law and in this case Title 18 U.S. Code Sec. 1001. The FAA, the airlines and the traveling public place a heavy burden, and rightfully so, on the Nation's airmen. It is morally imperative and dutifully necessary that airmen abide by the law and the rules and regulations of aviation. The rules and regulation of aviation are written in blood. It is also paramount for pilots to be physically and mentally fit and ready to tackle the high demands of piloting aircraft that carry crew and hundreds of passengers. Aviation physiology is a well-established study, and experience has shown that well-rested, physically and mentally fit airmen are the foundation and the corner stone of aviation safety. In short, having a valid medical certificate is a lifelong commitment and a required tool in the pursuit of the constitutionally protected right to life, liberty and happiness.

Complaint

# FAA HANDS OFF APPROACH

The FAA has a hands-off approach and entrusts the daily decisions of fitness for duty[3] to pilots themselves.  Pilots and airlines must follow well established regulations related to fitness for duty under 14 CFR § 61.53, and under 14 CFR Part 117 and pilots must maintain compliance with the standards established by the FAA under 14 CFR Part 67.  It is the pilot, and only the pilot, who can make that determination on a daily, hourly and minute-by-minute basis. Each pilot will make that assessment independently and render a decision that is unique to their understanding.

Pilots must be fit for duty before reporting to their duty shift and must sign statements of "fitness for duty" before every flight.  The signed statements are required by law and are submitted to the FAA.  If pilots sign fit for duty while not meeting the standards of their medical certificate, or slightly impaired for any reason, the pilots, aside from the potential harm to life and property in doing so, may be subject to $250,000.00 fine and up to five years in prison or both under 18 U.S. Code § 1001.  In short, pilots shoulder a heavy burden and responsibility, and under FAR § 91.3[4] the plaintiff bears directly the full responsibility for every soul on board the aircraft.

Fitness for duty goes hand in hand with safety and neither begins at the flight deck door, it is rather a 24/7, 365 day none stop event in a pilot's lifetime.

---

[3] Definition of duty under the FAA is the following: Duty means any task that a flightcrew member performs as required by the certificate holder, including but not limited to flight duty period, flight duty, pre-and post-flight duties, administrative work, training, deadhead transportation, aircraft positioning on the ground, aircraft loading and aircraft servicing.

[4] FAR § 91.3 Responsibility and authority of the pilot in command. (a) the pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft.

Complaint

# EXECUTIVE ORDER 13998

With the advent of the Corona virus, the President of the United States issued an executive order to combat the spread of the disease caused by the virus. Executive Order 13998 (EO 13998) dated January 21, 2021, was issued to promote safety in domestic and international travel. EO 13998 Sec. 2 Initiated an immediate action to require mask-wearing on certain domestic modes of transportation. Sec. 2. (a) of EO 13998 states in part: "*Mask Requirement. The Secretary of Labor, the Secretary of Health and Human Services (HHS), the secretary of Transportation (including through the Administrator of the Federal Aviation Administration (FAA)), the Secretary of Homeland Security (including through the Administrator of the Transportation Security Administration (TSA) and the Commandant of the United States Coast Guard), and the heads of any other executive departments and agencies (agencies) that have relevant regulatory authority (heads of agencies) shall immediately take action, **to the extent appropriate and consistent with the applicable law**, to require masks to be worn in compliance with the CDC guidelines.*" In addition, EO 13998 Sec. 2. (c) states in part: "*Exceptions. The heads of agencies may make categorial or case-by-case exceptions to policies developed under this section, **consistent with applicable law, to the extent that doing so is necessary or required by law**. If the heads of agencies do make exceptions, they shall require alternative and appropriate safeguards, **and shall document all exceptions in writing**.*" Additionally, EO 13998 Sec. 6. states in part: "*General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect: (i) the authority granted by law to an executive department or agency, or the head thereof.*" The TSA was tasked with the implementation of the executive order. The TSA issued Security Directives (SD) to airport and aircraft operators reflecting the CDC mask order.

# TSA SECURITY DIRECTIVE & JURISDICTION

The TSA issued a Security Directive SD 1542-21-01A (B, C, & D) addressing airport operators. A similar document, SD 1544-21-02 was issued to aircraft operators. Both documents

8

Complaint

1   contain an exemption in paragraph F3.  The exemption states: This SD exempts the following
2   categories of persons from wearing masks F – *3. People for whom wearing a mask would create*
3   *a risk to workplace health, safety, or job duty as determined by the relevant workplace safety*
4   *guidelines or Federal regulation.*

5

6   Exemption F3 contained in the SDs issued by the TSA correctly applies 49 U.S. Code
7   §114.  Under 49 U.S. Code § 114 (g) (2) Authority of other departments and agencies – The
8   authority of the Administrator under this subsection shall not supersede the authority of any other
9   department or agency of the Federal Government under law with respect to transportation or
10  transportation-related matters, *whether or not during a national emergency*.  The TSA may not
11  supersede the FAA.

12

13                    SAFETY ALERT FOR OPERATORS

14

15  The FAA has issued a document titled Safety Alert for Operators 20009 (SAFO 20009).
16  SAFO 20009 is an advisory document in nature and the following statement precedes its contents:
17  "*A SAFO contains important safety information and may include recommended action.  Besides*
18  *the specific action recommended in a SAFO, an alternative action may be as effective in addressing*
19  *the safety issue named in the SAFO.  The contents in this document do not have the force and*
20  *effect of law and are not meant to bind the public in any way.  This document is intended only*
21  *to provide clarity to the public regarding existing requirements under the law or agency*
22  *policies.*"  Additionally, the SAFO 20009 contains references to the CDC order for mask wearing
23  where the following exemption is contained therein: "*While the wearing of masks on aircraft is*
24  *required, the Order includes an exemption if wearing a mask would create a risk to workplace*
25  *health, safety, or job duty as determined by the relevant workplace safety guidelines or federal*
26  *regulations.*"

27

28

9

# EXCLUSIVE AREA AGREEMENT

The plaintiff alleges that AA has exclusive area agreements under Title 49 of the U.S. Code in many of its hubs.  49 CFR § 1542.111 – Exclusive area agreements state in part under (a): "TSA may approve an amendment to an airport security program under which an aircraft operator or foreign air carrier that has a security program under part 1544 or 1546 of this chapter assumes responsibility for the specified security measures for all portions of the secured area, AOA, SIDA, including access points, as provided in § 1542.201, § 1542.203, or § 1542.205.  The assumption of responsibility must be exclusive to one aircraft operator or foreign air carrier, and shared responsibility among aircraft operators or foreign air carrier is not permitted for an exclusive area."

An aircraft operator who has secured an exclusive area agreement must develop an airport security program (ASP).  The plaintiff alleges that under the Airport Rescue Grants (ARG) and the Airport Coronavirus Response Grant Program (ACRGP), both dated November 24, 2021, AA received funding for their ASP which directs AA to comply with the TSA Security Directives linked to the enforcement of masking in airport terminals.  Under this scheme, the plaintiff alleges that a conflict of interest is present as discussed below.

# CONFLICT OF INTEREST

Dated November 24, 2021, both the Airport Rescue Grant (ARG) and the Airport Coronavirus Response Grant Program (ACRGP), administered by the FAA provided voluntary financial assistance to airport sponsors throughout the United States. In a frequently asked questions document for the ARG and the ACRGP the following statements, which are nearly identical, state:

10

Complaint

1    "This document answers frequently asked questions (FAQs) stakeholders may have related

2    to the approximately $8 billion in grants for airports under the American Rescue Plan Act of 2021

3    (ARPA), (*plaintiff noted: $2 billion under the ACRGP*).  The Federal aviation Administration

4    (FAA) has additional information for the airport sponsors concerning COVID-19 at

5    www.faa.gov/airports.  The guidance here is not legally binding in its own right and FAA will not

6    rely on it as a separate basis for affirmative enforcement action or other administrative penalty.

7    Conformity with this guidance, as distinct from existing statutes, regulations, and grant assurances,

8    ***is voluntary only***, and nonconformity will not affect existing rights and obligations.  In addition to

9    these grants, FAA is administering approximately $10 billion in grants for airports under the

10    Coronavirus Aid, Relief, and Economic Security (CARES) Act and approximately $2 billion under

11    the Coronavirus Response and Relief Supplemental Appropriation (CRRSA) Act, 2021.   For

12    information on CARES Act funding, please visit https://www.faa.gov/airports/cares_act/.   For

13    information on CRRSA Act funding, please visit https://www.faa.gov/airport/crrsaa/."

14

15    Within both documents exists question number Q-GA17, which asks the following: "**Are**

16    **there any requirements related to mandating masks inside airports associated with airport**

17    **rescue grants?**"

18

19    The answer to question Q-GA17 is the following: "Yes.  Under the Executive Order 13998,

20    *Promoting Covid-19 Safety in Domestic and International Travel,* (Executive Order 13998) issued

21    on January 21, 2021, the Secretary of Transportation must require masks to be worn in compliance

22    with the CDC Order in airports, ***consistent with applicable laws***.  To accomplish this requirement,

23    and to achieve the legislative purposes of preventing and responding to coronavirus disease 2019

24    (COVID-19), each Airport Rescue Grant agreement will include a special condition that the airport

25    sponsor implement a policy requiring all persona to wear a mask, in accordance with the CDC

26    Order and TSA Security Directive, as applicable, at all times while in all public areas of the airport

27    property, ***except to the extent exempted*** under those requirements.   The CDC and TSA

28    requirements exempt certain categories of persons from the mask-wearing mandate: a child under

29    age of two, a person with disability who cannot wear or safely wear a mask because of the

30    disability, ***or a person for whom wearing a mask would create a risk to workplace, safety, health,***

11

Complaint

1   ***or job duties.***  This special condition requires the airport sponsor continue to require masks until

2   Executive Order 13998 is no longer effective.  Failure to comply with this special condition may

3   result in the ***suspension of payments or termination of the grant***, consistent with CFR §§ 200.339

4   and 200.340.    For Additional Department of Transportation guidance on masks, see

5   https://www.transportation.gov/safety/mask-travel-guidance."

6

7        Under the ARG and the ACRGP programs, the hub airports of AA and other airports that

8   AA serves received hundreds of millions of dollars in Federal grants.  Plaintiff alleges that AA

9   voluntarily benefited directly from the Federal funding at hub airports where AA has an ASP and

10  indirectly at airports AA serves.  The risk of losing Federal funding clouded the judgment and

11  decision-making for AA.  The plaintiff alleges that there may be other funding containing language

12  of mask enforcement the plaintiff is unaware of at this time.

13

14       Even though the SDs issued by the TSA provided an exemption in F3, AA created company

15  mask policies that directly contradicted the exemption and Federal regulations and compelled most

16  of its pilots to comply in violation of the medical standards established by the FAA.  The plaintiff

17  alleges that the Federal funding and AA mask policies, discussed below, were in direct conflict

18  and created a risk to pilots and crew and passengers alike.

19

20

21  TRAINING AND KNOWLEDGE

22

23       Whether AA secured an exclusive area agreement or not, as an aircraft operator, AA is

24  responsible for ensuring that security personnel are trained on SDs per 49 CFR § 1544.235.  49

25  CFR § 1544.235 – Training and knowledge for individuals with security-related duties - (b) states:

26  Each aircraft operator must ensure that individuals performing security-related duties for the

27  aircraft operator have knowledge of the provisions of this part, applicable Security Directives and

28  Information Circulars, the approved airport security program applicable to their location, and the

Complaint

aircraft operator's security program to the extent that such individuals need to know in order to perform their duties.

Experience and anecdotal evidence indicate that such security personnel did not receive the proper training on TSA Security Directives related to masking and forced pilots to place a facial mask over the nose and mouth in contradiction to the exemption contained in F3.

# AA HAPHAZARD POLICIES

The plaintiff alleges that under the guidance and approval of captain Chip long, the senior VP of Flight Operations and the enforcement by Directors of Flight such as captain Timothy Raynor and others in similar positions, AA created mask policies haphazardly which placed pilots and crew and passengers in grave danger.  The plaintiff alleges that AA dispatched certain flights manned by pilots who may have unwittingly violated the medical standards of their FAA issued medical certificate.   Airline pilots must follow and do rely heavily on the airline operations manuals that guide them through their daily tasks.  Safety is paramount and pilots must also follow **all** the FAA rules and regulations as written in FAA publications.

For example, contained in the AA manual is one very important FAA regulation related to medical conditions.  The regulation was paraphrased resulting in a materially altered meaning of the rule.  The stark difference between what AA published in the manual and the actual language of the rule cannot be ignored or underestimated.  The source for the rule is the Federal Aviation Regulations (FARs).   The specific rule is FAR § 61.53 which in part states in paragraph (a) the following: "…..no person who holds a medical certificate issued under part 67 of this chapter may act as pilot in command, or in any other capacity as a required pilot flight crewmember, while that person: (1) ***Knows or has reason to know of any medical condition that would*** make the person unable to meet the requirements for the medical certificate necessary for the pilot operation….."

13

Complaint

1    While AA references the above rule as the source, the manual paraphrases it to state the
2    following: "***Do not report for duty or start a flight segment with a known medical deficiency that***
3    ***would not meet medical certificate requirements.***"

4

5    At the time the AA manual was published and approved by the airline FAA Principal
6    Operations Inspector[5] (POI), no one envisioned pilots being forced to accept certain medical
7    procedures or mask wearing.  Again, the FAA has not amended or issued an exemption to the
8    medical standards established under FAR Part 67 to reflect the use of masks by pilots and, even
9    though the plaintiff brought it to captain Raynor's attention, AA did not address the reference to
10   FAR § 61.53 to reflect and clarify the true meaning of the regulation.

11

12   Another AA created mask policy requiring pilots to wear masks during the Covid-19
13   pandemic bucked the safety mantra in aviation.   For example, AA selectively created a policy
14   which complied with the TSA SD containing the mask exemption for pilots.  The AA policy, while
15   for safety reasons dictated that pilots did not have to wear a mask on the flight deck, allowed pilots
16   who wished to wear a mask to do so in violation of their medical certificate and the safety reasons
17   cited for not wearing one.  The policy, while materially reaffirms the fact that pilots are the final
18   authority in decision making when complying with the standards of their medical certificates,
19   encouraged those who wished to wear a mask to do so.

20

21   Another flawed policy required the pilot remaining on the flight deck to wear a mask when
22   one pilot must leave for physiological reasons.  The plaintiff alleges that AA did not have any
23   training program and has not trained pilots on the removal of facial masks and the donning of
24   oxygen masks in events such as rapid decompression or smoke and fumes on the flight deck, both
25   critical to the survival of the pilots and the safe outcome for crew and passengers.  A single pilot
26   on the flight deck at the controls wearing a facial mask places the entire ship, and crew and
27   passengers in grave danger should such an event occur.  The plaintiff himself has not received any
28   such training and none was offered.

---

[5] POI is the liaison between commercial air carriers and the FAA

Complaint

1       AA mask policy also required pilots to wear masks while deadheading[6]. The plaintiff

2   alleges that this policy resulted in gross violations of the FARs. Pilots who wear a mask while

3   deadheading for hours at cabin altitudes of several thousand feet create a huge medical deficiency

4   and have no way of knowing if they meet the standards of their FAA issued medical certificate

5   rendering them illegal while on duty and in violation of their signed fit for duty statements. Such

6   a condition was confirmed to the plaintiff by his AME.

7

8       Pilots who wear a mask in airport terminals for hours on end as they wait for their aircraft

9   to arrive face the same outcome. Anecdotal evidence shows that pilots coped with the AA mask

10  policies by "cheating", placing the mask below their nose or pretended to be drinking or eating.

11  Those who were deadheading did not have that luxury for they were harassed by flight attendants

12  and forced to wear masks. Flight attendants who are there for safety became the mask police.

13

14      The plaintiff at one point was contacted by a pilot who stated that he would carry an

15  oximeter, and that by the time he arrived at the flight deck after a walk through the terminal, his

16  oxygen levels would be low enough to qualify for supplemental oxygen. He would then use the

17  oxygen mask available to pilots on the flight deck for emergencies to bring his oxygen levels up

18  before signing fit for duty for the flight. Pilots should not be forced to extreme measures to comply

19  with the medical standards of their medical certificates placing crew and passengers at risk.

20

21      In addition, the plaintiff alleges that AA did not develop or provide training to pilots or

22  flight attendants who performed duties on aircraft operating above altitudes of 25000 feet (flight

23  level FL250) as required by the FARs with a facial mask on. Rule FAR § 121.417 requires airlines

24  to provide training in emergency procedures for crewmembers who operate aircraft above FL250.

25  Such training must include emergency procedures for decompression, respiration, hypoxia and

26  duration of consciousness without supplemental oxygen at altitudes. The plaintiff alleges that he

27  received such training in the past, but since AA created their mask policies, he did not receive and

28  was not offered any such training with a mask on.

---

[6] Deadheading is where a pilot is transported in the cabin to where said pilot can perform other duties for the airline or begin a new flight segment.

Complaint

Additionally, AA developed a Public Address (PA) announcement stating that masking was a federal law and directed the captains to mandatorily make such announcements during the boarding process.  The plaintiff alleges that a law forcing passengers to wear a facial mask never existed and AA forced the captains to lie to the passengers in direct violation of AA's first rule of PA making which directs captains to never lie.  At some point in November of 2021, AA corrected the PA announcement to reflect the true nature of the mandate but kept their website reference to a law unchanged.

A passenger who wished to fly on AA was forced to agree to wearing a mask for the flight.  The plaintiff alleges that AA placed the passengers in grave danger.   In the case of a decompression, the passengers, who are already oxygen deficient because of mask wearing, would suffer harm and possible death during such an event no matter how rare the event may be.  The passenger safety briefing and demonstration by the flight attendants did not visually demonstrate to the passengers the removal of the facial mask.  Flight attendants demonstrated the use of oxygen with the facial mask on.  The flight attendants would then make a last-minute announcement to remind the passengers to take the facial mask off first.

During the hearing and the following meetings with management, the plaintiff raised the safety concerns of the mask policy and stated that the policy was dangerous, but none of the concerns were addressed and management forged ahead with continued punishment of the plaintiff.

## COERCION AND INTIMIDATION

The plaintiff alleges that AA used the pilots' job security to force them into compliance with their flawed mask policies and other medical treatments.  AA threw its weight around and compelled pilots to submit to acts that potentially violated their medical certificates.  The plaintiff disagreed with AA's mask policies related to pilots and others and expressed his concerns to AA,

Complaint

1    but they were summarily dismissed.  In a meeting with captain Timothy Raynor, the plaintiff

2    expressed his position regarding his authority over his medical certificate and captain Raynor

3    proclaimed that the discussion over the mask had nothing to do with a pilot's FAA medical

4    certificate.  The plaintiff could not disagree more.

5

6        The plaintiff alleges that, just like himself, many pilots were given administrative

7    reprimand for not wearing masks and letters threatening termination were placed in their files.

8

9                          EVENTS OF DEC. 6TH 2021

10

11        On December 6th, 2021, the plaintiff was the assigned captain for AA flight 484 (AA484).

12   The flight was scheduled to depart the Spokane International Airport at 6 a.m., destination Dallas

13   Fort Worth.  The crew consisted of the captain, the co-pilot and a three-member cabin crew.  That

14   morning and in accordance with FAR § 91.3[7] the plaintiff was responsible for over 150 souls on

15   board that aircraft.

16

17        According to AA procedures, the sign in for the duty shift began at 5 a.m.   At 5:15 a.m.,

18   the plaintiff arrived at the TSA security check point and, after presenting his credentials, was

19   cleared through by the TSA officer (TSO).  The plaintiff did not wear a mask in compliance with

20   his medical certificate requirements and exemption F3 contained in the TSA SD.  The TSO asked

21   the plaintiff to wear a mask.  The plaintiff engaged in a discussion with the TSO explaining aviation

22   law and exemption F3 contained in the SD.  The plaintiff produced all relevant documents, but the

23   TSO appeared to not understand and insisted on contacting the airport police.  Instantly, three

24   airport police officers appeared.  The police insisted that the plaintiff must wear a mask, that it was

25   the Governor's order that he must wear a mask.  Again, the plaintiff attempted, but the police

26   refused to listen to the plaintiff's explanation of aviation law and exemption F3, and again insisted

27   that he places a mask over the nose and mouth.

---

[7] FAR § 91.3 Responsibility and authority of the pilot command. (a) The pilot in command of an aircraft is directly
responsible for, and is the final authority as to, the operation of that aircraft.

Complaint

1      The plaintiff has a duty and responsibility towards his crew and passengers, and by law

2   and for safety he must abide by the standards of his FAA issued medical certificate. The logical

3   and prudent response was for the plaintiff to not wear a facial mask.  The plaintiff was then released

4   without wearing a mask after about a fifteen-minute detention.

5

6      The police actions did not end there.  The police immediately notified AA, the plaintiff's

7   employer and upon arrival at the Dallas Fort Worth Airport he was removed from flying status and

8   placed on administrative leave pending a disciplinary hearing.  Things took a turn for the worst for

9   the plaintiff and AA, through several hearing, turned his life upside-down, all because the plaintiff

10  followed the safety standards and the law to protect his crew and passengers on that morning of

11  December 6th, 2021.

12

13

14                          DISCIPLINARY ACTIONS

15

16      Upon arrival at the Dallas Fort Worth airport, the plaintiff's co-pilot informed him that he

17  now has another captain he is working with.  The plaintiff contacted pilot scheduling and he was

18  asked to call his Phoenix base chief pilot captain Kenneth Wood (Ken).  The plaintiff knew Ken

19  for many years and had a discussion with him. Ken told the plaintiff: "Washington State is coming

20  after you, what have you done?"  The plaintiff asked if Ken remembered FAR § 61.53 and if he

21  knew that there is an exemption in the SD issued by the TSA and Ken responded that he did not.

22  The plaintiff provided the reference and Ken responded in a text message after looking it up in the

23  following: "I found FAR 61-53 a, b. Which per of the CDC was it.  I wrote down CDC order

24  footnote 7?"

25

26      Ken informed the plaintiff that he was asked by his manager to give the plaintiff a

27  "directive" and that Ken's own manager (the plaintiff alleges the manger is the Senior Vice

28  President of Flight Operations Chip Long) told him "If the plaintiff did not comply, we got him

29  on insubordination" but Ken, not knowing the law and the fact that he knew the plaintiff for years

Complaint

1    and knew of his impeccable record, was not about to do it and did not. He later was disallowed to
2    actively participate in any of the disciplinary hearings (section 21) and was only allowed as an
3    observer in the first hearing that was conducted by another captain, Timothy Raynor, flown in
4    from AA's Chicago O'Hare hub. The plaintiff alleges that AA was intent on terminating him
5    immediately for not wearing a mask. The plaintiff does not wear the mask for safety and in
6    compliance with the FARs and the CDC mask order.

7

8        Pilots at AA have an opportunity to participate in flying that is classified as premium.
9    Premium flying pays 50% more than regular flying and the plaintiff was conducting such flying
10   when removed in Dallas Fort Worth. Plaintiff would be pay protected for that sequence of flights,
11   but he was denied any flying from December 6th, 2021, through mid-January 2022 while AA
12   conducted their investigation. The plaintiff received the base pay for that period.

13       APA refused to defend the plaintiff's position of safety and of protecting his authority over
14   decisions he makes related to his FAA medical certificate. APA stated so in communications with
15   the plaintiff and went as far as stating the opinion that masking does not violate any of the
16   plaintiff's rights. The plaintiff was left to defend his position on his own behalf. The parties, AA
17   and the plaintiff, must follow the Joint Collective Bargaining Agreement (JCBA) section 21
18   process. In accordance with the JCBA, the plaintiff is entitled to relevant documents in his defense
19   and although he asked for the relevant documents, AA refused to provide any documents and
20   insisted that the only documents were what was in the company manual.

21

22       The first disciplinary hearing was scheduled for January 6th, 2022. The plaintiff asked for
23   a reschedule, in accordance with the JCBA, because he did not receive any documents or evidence
24   that he violated anything and was not ready to proceed without the documents, but the AA Director
25   of Flight, captain Timothy Raynor refused and proceeded to threaten unknown outcomes and
26   possibly termination of the plaintiff if a reschedule was granted. The plaintiff asked for a
27   reschedule no less than three times and was refused and intimidated into going through the hearing
28   on January 6th, 2022. The plaintiff had no choice but go through for fear of termination.

29

Complaint

The hearing was transcribed and during the discussion the plaintiff was able to obtain several admissions on record from captain Raynor. It is on the record that AA arrived at an agreement with the Spokane Airport police to prosecute the plaintiff internally. Captain Raynor used language such as "shy of a mug shot or you being on a police blotter" as if the plaintiff is some sort of a criminal, defaming him in the presence of other AA employees one of which was Michelle Montgomery, a senior manager of labor relations who did not object to the language used.

During the hearing captain Raynor contended that a mask restricting breathing does not have any bearing on a pilot's FAA medical certificate yet raised the question of fitness for duty. Captain Raynor displayed a fundamental lack of understanding of how a fitness for duty determination is made and suggested that 14500 pilots wearing masks is a good indication and that the plaintiff should follow and wear a mask. The plaintiff contends that 14500 pilots were forced to wear a mask and may be in violation of their FAA medical certificate. Fitness for duty and the decision-making authority relating to a pilot's medical certificate is vested in the pilot by the FAA. Neither AA nor the plaintiff has any authority dictating to other pilots how decisions related to their medical certificate are concluded.

When asked, captain Raynor stated that in no way he would do anything to jeopardize his medical certificate. He also stated that the reason for wanting the plaintiff to wear a mask is because the plaintiff is in a leadership position and AA needed him to do so to project a certain image so crew and passengers alike would follow, regardless of how it affects the pilot's medical standards.

The plaintiff offered captain Raynor authority over his medical certificate if AA could show they have jurisdiction or authority, and if that were the case the plaintiff would do anything AA asks of him to do, and captain Raynor replied in the negative indicating AA cannot do that.

The hearing went on for an hour and twenty-two minutes and consisted of an interrogation during which the plaintiff never admitted to violating any company policy, always adhering to the

20

Complaint

1   fact that he was following the FARs and the mask mandate.  The entire hearing was witnessed on

2   the plaintiff's side by Dave Maher, a KPHX based first officer.  At the end of the hearing the

3   plaintiff was issued a directive to follow the company policy and the Federal mask mandate.

4

5          The following day captain Raynor contacted the plaintiff over the phone and at the end of

6   an extended monologue, captain Raynor asked the plaintiff if he will follow the company mask

7   policy.  The plaintiff replied that he already agreed to follow the company policy and the federal

8   mask mandate which contains an exemption for pilots, which was what he was doing at the

9   Spokane International Airport to begin with, and immediately sent him an image of the transcript

10  in a text message.

11

12         That same day captain Raynor issued a written notice which was inserted in the employee

13  file.  The plaintiff made his disagreement to the letter known to AA in writing.  The written

14  advisory is one step from termination and the plaintiff considers it a threat to his job security and

15  the security of his family.  Considering what the plaintiff experienced and learned, he determined

16  that the letter is the perfect trap that he must avoid at any cost.  Any event involving a mask would

17  be an immediate termination of his employment.

18

19         In an email that contained the written advisory, captain Raynor added the following:

20  "Additionally, should you have a reason to request an accommodation, you may do so through the

21  links in Jetnet.  For your convenience, here is the current link to the page in Jetnet that gives you

22  more information about that process.  Americans with Disabilities Act (ADA) Jetnet (aa.com)."

23

24         It is ironic that after an impeccable 24-year career with the airline, suddenly a healthy 58-

25  year-old captain must declare a disability in order to be able to comply with his duty and authority

26  under the Federal Aviation Regulations.

27         The plaintiff exhausted every avenue and followed the process outlined in the JCBA to

28  have the notice removed from his file but to no avail.  APA was of no help and sided with AA

29  against the plaintiff.  At the last hearing dated March 30th, 2022, the appeal to captain Chip Long

21

1   for the removal of the written advisory, the plaintiff declared that he considers the written advisory
2   a threat to his job security and the health of his family.  He agreed that AA can make policies, but
3   that AA cannot make any policies that supersede the FAA and the medical standards outlined by
4   the FAA, or the authority vested in him by the FAA.

5        After all the hearings and considering the declaration of the unconstitutionality of the mask
6   mandate, the plaintiff, per the JCBA cleared sick and was ready and available to return to work.
7   Shortly thereafter captain Raynor, following orders from his manager captain Long and taking
8   direction from AA legal department, placed the plaintiff on administrative leave with pay through
9   the month of May 2022, pending an evaluation of his fitness for duty.  The plaintiff had just
10  received an FAA medical examination on the 28th of March 2022 and updated his records to reflect
11  the event.
12
13        Considering that by law it is the pilot who determines fitness for duty, and after a medical
14  examination and consultation with the plaintiff's own AME, the plaintiff is left to conclude and
15  alleges that the process that AA is intent on subjecting the plaintiff to is partial, subjective and
16  detrimental to a pilot's career and medical certificate.  AA is intent on painting the plaintiff as an
17  unstable individual who does not meet the standards of an FAA medical certificate.  If successful,
18  the plaintiff would lose his ability to obtain an FAA medical certificate and will not be able to fly
19  airplanes for any airline or privately.
20
21        This ordeal has taken a heavy toll on the plaintiff, mentally and physically and placed his
22  impeccable 24-year career teetering on termination.  The plaintiff's family suffered as well.  AA's
23  actions have placed an enormous amount of stress on the daily life of the plaintiff and his family.
24  The only available remedy to the plaintiff is to avoid falling in a trap of retaliation set by his
25  employer AA.
26
27
28

Complaint

# HOBSONS CHOICE

Prior to the order of the Florida Circuit Court, the defendants set the trap and placed the plaintiff in an untenable position. The plaintiff had a "Hobson's Choice" to make. Go to work, comply with the FAA medical certificate requirements and risk action by AA terminating his employment for violating the "written notice" placed in his file, or go to work and place a mask over the nose and mouth and violate the FARs requirements for the issuance of a medical certificate or even worse, abuse the authority vested in the plaintiff by the FAA and place crew and passengers in danger.

Additionally, there exists another unspoken risk for violating the standards of the medical issuance. Pilots live in a what if world. Pilots are always preparing for the worst and if an incident happens, the first thing a pilot is faced with is testing by the FAA or authorities of the pilot's blood, breath and anything that may affect his health. Questions will be asked about everything from rest time the pilot received and how fit for duty the pilot was before operating the aircraft. The one threat that pilots face is prosecution by a lawyer representing a party who is hurt by an incident or an accident. It is a violation of the pilot's medical certificate to create a deficiency by placing a facial mask over the nose and mouth while on duty.

The plaintiff alleges that AA does not have the authority to create and assign risk attached to a pilot's medical certificate. A pilot's medical certificate is the product that the pilot has full authority over, and it is the plaintiff's duty and responsibility, in the interest of safety, to provide a valid medical certificate to AA.

23

Complaint

# IN CONCLUSION

In conclusion the plaintiff alleges the following:

1 – That AA and its agents created a policy that violates aviation law.

2 - That AA superseded the FAA and the FARs and dispatched flights illegally.

3 - That AA placed pilots, flight attendants and passengers alike in grave danger.

4 - That AA created a hostile work environment, defamed and attacked the plaintiff's character.

5 - That AA disadvantaged the plaintiff financially and created and placed him in an untenable position.

6 - That in violation of the collective bargaining agreement and in retaliation, AA has demanded a "fitness for duty" assessment of the plaintiff causing irreparable harm to the plaintiff's FAA medical certificate.

# PRAYER FOR RELIEF AND REMEDY

WHEREFORE, plaintiff respectfully requests the Court enter the following judgment and relief:

A – Enter a permanent injunction against defendants' continued enforcement of masking on pilots in violation of 14 CFR Part 67 medical requirements.

Complaint

B – Declare actions taken by the defendants a violation of the TSA Security Directives.

C – Declare the enforcement of mask wearing upon pilots a violation of FAR § 61.53.

D - Declare the enforcement of mask wearing upon pilots a violation of the pilot's authority of decision making relating to his health and safety and the safety of crew and passengers.

E – Declare the enforcement of mask wearing upon pilots a health-related matter and that AA may not supersede the pilot's health decisions and authority in declaring fit for duty.

F – Instruct defendants to remove the written notice placed in the plaintiff's file and reinstate plaintiff to flying status immediately.

G – Issue judgment in plaintiff's favor on all causes of action alleged herein pursuant to 42 U.S. Code § 1983.

H – Enter judgment against defendants and award plaintiff compensatory damages in the amount of $ 126,089.00 (damages may adjust to higher amounts with passage of time).

I – Enter judgment against defendants and award plaintiff punitive damages for pain and suffering in the amount of $22,000,000.00, or higher amounts as the court sees fit to punish defendants for their actions.

J – Award plaintiff reasonable costs and attorney fees, if retained, pursuant to 42 U.S. Code § 1988; and,

K – Grant plaintiff other and further legal and equitable relief as the Court deems just and proper.

Complaint

# JURY DEMAND

NOW COME plaintiff, PRO SE, and hereby demands trial by jury of the above-referenced causes of action.

Dated: May 2nd 2022

Bahig Saliba
10824 East Santa Fe Trail
Scottsdale, AZ  85262
Tel. 480-235-0304
Email:  medoverlook@protonmail.com

Complaint