1   Bahig Saliba

2   10824 East Santa Fe Trail

3   Scottsdale, Arizona  85262

4   Ph. 480-235-0304

5   Email: medoverlook@protonmail.com

6

7   **IN THE UNITED STATES DISTRICT COURT**

8   **FOR THE DISTRICT OF ARIZONA**

9

10  **Bahig Saliba,**                           Case No.  CV-22-738-PHX-SPL

11  **Plaintiff,**

12  **v.**                                       **THIRD AMENDED COMPLAINT**

13  **American Airlines Inc.;**                  **AND JURY DEMAND**

14  **Chip Long, Sr. VP of Flight;**

15  **Timothy Raynor, Dir. of Flight;**

16  **And**

17  **Alison Devereux-Naumann, Chief Pilot,**

18  **Defendants,**

19

20

21      COMES NOW plaintiff, *Pro Se,* Bahig Saliba, an airline captain in the employ of American

22  Airlines, Inc. (AA) and files this third amended Complaint against his employer and against Chip

23  Long, acting as Senior Vice President of Flight, Timothy Raynor, acting as Director of Flight Chicago

24  and Phoenix, and Alison Devereux-Naumann acting as chief pilot for the AA Phoenix pilot base.

25  (Defendants)

This dispute arises out of Defendants' implementation of a so called "mandatory" health-related policy. The policy, if a pilot is willing and chooses to accept[1], constitutes an amendment of the terms of the employment Contract (Contract) with American and a violation of Public Policy. The Plaintiff rejected the policy and any amendment to his Contract relating to health decisions he makes. Nevertheless, Defendants acted to enforce their policy against Plaintiff in breach of the Contract. The dispute came to head after a December 6, 2021, event at the Spokane International Airport. The plaintiff alleges that (1) Defendants created and implemented a mandatory health-related company policy (Policy) that directly violated the employment Contract between Plaintiff and Defendant American that the Plaintiff rejected. (2) Defendants created and continue to create a hostile work environment and wrongfully invoked a disciplinary process reserved for disputes rooted in terms and conditions agreed to in Collective Bargaining Agreements (CBAs). (3) Defendants became State actors by their actions following the event of December 6, 2021, violating Plaintiff's constitutional rights, namely his Fourteenth Amendment rights. (4) Defendants created and implemented mandatory facial masking policies, (*See Montgomery declaration Doc. 19*) and by implementing said policies and in furtherance of financial gains and advancement of a political agenda, Defendants contradicted and violated aviation law and superseded the Federal Aviation Regulations (FARs) in violation of Public Policy.

## EMPLOYMENT CONTRACT

In the Complaint, (Doc. 1) Plaintiff claims a violation of "a contract in existence between the plaintiff and AA" (Doc. 1 at 2) Plaintiff then briefly elaborates on the terms of said contract. (Doc. 1 at 4).

Blacks Law 5th edition defines Contract as: An agreement between two or more persons which creates an obligation to do or not to do a particular thing. Its essentials are competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligations. *Lamoureux v. Burrilville Racing Ass'n,* 91 R.I. 94, 161 A2d 213, 215. Furthermore, Blacks Law 5th edition defines

---

[1] By abdicating authority of health-related decisions to his employer or any other entity, a pilot will have willfully violated the Federal Aviation Regulation. That authority is vested in the pilot operating aircraft and not in the aircraft operator i.e., American Airlines or any other entity.

Employment Contract as: An agreement or contract between employer and employee in which the terms and conditions of one's employment are provided.  (*See* Exhibit A documents in support of Plaintiff's employment contract with the airline) The Plaintiff's employment contract meets Blacks Law definition.  Details such as rates of pay, work rules and work conditions, with the exception of his FAA issued medical Certificate and health-related decisions the Plaintiff elects to make, are then managed under a CBA, and in American Airlines case a JCBA[2].  Of particular importance in exhibit A is the AWA 00209 document followed by the Flight Operations Manual (FOM) document detailing terms of the Contract relevant by importance to this complaint. The FOM clearly states in paragraph 9.157 (a) that "It is each pilot's responsibility[3] to maintain a current medical certificate appropriate for the crew position he/she currently holds…" and in paragraph (f) "…meet the medical or physical standards required by regulation or common sense for their crew position." The terms of the Contract are grounded in Public Policy, the Federal Aviation Regulations (FARs), which are the bedrock of the Contract and satisfy the mutuality of obligations element, the Plaintiff's obligation to maintain his FAA issued pilot medical Certificate and the acceptance of said Certificate by AA.  To date and until Defendants imposed new terms in breach of the Contract, there has not been any change or amendment to the FARs or American's manuals contradicting this specific Contract term, it's meaning or intent. The Plaintiff asserts this Contract term is not subject to negotiation or any company policies dictating health decisions a pilot makes affecting said Certificate, and that it is a statutory right and obligation independent of the JCBA.  The FAA medical Certificate is the foundational bases for the Contract with AA or any other flying the Plaintiff conducts commercially or privately as he often does.

Additionally, pilot positions, at major airlines in particular, are coveted and historically it is a customary practice and understanding in the aviation industry for many decades, because of the seniority structure, that pilots spend most if not all of their flying careers at one airline as is the case for the Plaintiff.  Therefore, it is understood that an employment Contract is for a pilot's professional

---

[2] Referring to the CBA that combined the pilot groups of US Airways and American Airlines. US Airways included former America West Airlines and US Airways.  Plaintiff was originally an America West Pilot.

[3] Responsibility without authority is slavery.  Defendants are intent on assigning great responsibility to Plaintiff while depriving him authority.

1 life until mandatory retirement age or inability to maintain a medical Certificate which is inextricably

2 intertwined with Public Policy and is the foundation of such employment Contracts.

3

4 **AIRMEN MEDICAL CERTIFICATION**

5 The Plaintiff will expand on the FAA medical Certificate and the responsibility and authority

6 vested in him by statute. As outlined in 14 CFR § 61.2, airmen are required by law and FAA

7 regulations to go through a medical examination and receive a valid FAA medical Certificate in order

8 to exercise the privileges of their airman certificate[4]. *See* 14 CFR § 61.3 (c). As a captain for

9 American, the plaintiff must receive a medical examination every six months and once a year receive

10 an electrocardiogram (EKG). After a successful medical examination, the plaintiff ***must*** be issued a

11 First-class medical Certificate indicating he has met the rigorous medical standards established by the

12 FAA Aeromedical Department. Those standards have been established and listed under 14 CFR Part

13 67 of the code. The Aeromedical Physicians conducting such examination are authorized by the FAA

14 to issue medical Certificates and are referred to in the industry as AMEs.

15 The FAA publishes a guide titled Aeromedical Guide for AMEs (AME Guide). The AME

16 Guide outlines acceptable procedures and rules for conducting a physical examination. The applicant,

17 an airman, must meet the standards established under 14 CFR Part 67 for the medical certificate sought

18 to be issued by the AME and while on duty. Neither the AME Guide nor 14 CFR Part 67 have been

19 amended to contain guidance or reference to the use of facial masking. The FAA has not issued any

20 such exemption to the applicable standards required for the issuance of medical Certificates allowing

21 the use of facial masks by pilots and has always vested, under 14 CFR § 61.53 and 14 CFR Part 117,

22 the authority and obligation in the pilot the determination and maintenance of fitness for flight. In the

23 case of vaccination, The FAA did waive their general practice of a one year waiting period after the

24 final approval of a vaccine in favor of allowing pilots who choose to receive the experimental vaccines

---

[4] Airman certificate is the document detailing the qualifications of a pilot at any given stage in a pilot career progression.

to do so[5].  The FAA however did not waive the pilot authority and obligation under 14 CFR § 61.53.  *See* Exhibit B.

## AME GUIDE STATEMENT

Within the AME Guide on page eight resides the following paragraph:

*"Whoever in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact, or who makes any false, fictitious, or fraudulent statements or representations, or entry, may be fined up to $250,000 or imprisoned not more than 5 years, or both (Title 18 U.S. Code Secs. 1001; 3572)."*

Safety in aviation is paramount and the statement above is to be considered seriously. Aviators must abide by Title 18 U.S. Code Sec. 1001.  The FAA, the airlines, and the traveling public place a heavy burden, and rightfully so, on the Nation's airmen. It is morally imperative and dutifully necessary that airmen abide by the rules and regulations of aviation.  It is also paramount for pilots to be physically and mentally fit and ready to tackle the high demands of piloting aircraft that carry crew and hundreds of passengers. Aviation physiology is a well-established study, and experience has shown that well-rested, physically, and mentally fit airmen are the foundation and the corner stone of aviation safety.   In short, having a valid medical Certificate is a statutory right and a lifelong commitment and obligation and making false statements under § 1001 is a criminal offense.

## FAA HANDS OFF APPROACH

The FAA has a hands-off approach and entrusts the daily decisions of fitness for duty[6] to pilots themselves.  Pilots and airlines must follow well established regulations related to fitness for duty under 14 CFR § 61.53 and 14 CFR Part 117, and pilots must maintain compliance with the standards

---

[5] It is the Plaintiff's opinion that such a move by the FAA is purely political and determental to the mission of utmost safety in aviation.

[6] Definition of duty under the FAA is the following: Duty means any task that a flightcrew member performs as required by the certificate holder, including but not limited to flight duty period, flight duty, pre-and post-flight duties, administrative work, training, deadhead transportation, aircraft positioning on the ground, aircraft loading and aircraft servicing.

established by the FAA under 14 CFR Part 67.  It is the pilot, and only the pilot, who can make that determination on a daily, hourly, and minute-by-minute basis and the Plaintiff has done that for the last 37 years, 24 of which at American Airlines and American has accepted every declaration the Plaintiff has made satisfying the Contract.  Each pilot will make that assessment independently and render a decision that is unique to their understanding. Pilots must be fit for duty before reporting to their duty shift and must sign statements of "fitness for duty" before every flight.  The signed statements are required by law and are submitted to the FAA.  If pilots sign fit for duty while not meeting the standards of their medical Certificate, or slightly impaired for any reason, the pilots, aside from the potential harm to life and property in doing so, may be subject to $250,000.00 fine and up to five years in prison or both under 18 U.S. Code § 1001.  In short, pilots shoulder a heavy burden and responsibility, and under 14 CFR § 91.3[7] the plaintiff directly bears the full responsibility for every soul on board the aircraft.  Fitness for duty goes hand in hand with aviation safety and neither begins at the flight deck door, it is rather a 24/7, 365 day none stop event in a pilot's lifetime.

In short, the Plaintiff's FAA medical Certificate is under authority given to him to exercise, it is not given to the aircraft operator, and is the cornerstone of the employment Contract with AA and all health decisions the Plaintiff makes are fully under his authority at all times.


## AMERICAN AIRLINES CREATED POLICIES

Two mandatory policies created by American that violate the Contract and Public Policy were rejected by the Plaintiff.  Both policies are medical procedures that interfere with health decisions the Plaintiff makes affecting his Certificate and both constitute a breach or violation of the Contract terms and Public Policy.  The first is the facial masking of the Plaintiff, and the second is medical treatment or vaccination. (Doc. 1 at 16) Both mandatory policies were implemented under threat of discipline, termination, or accommodation in the case of vaccination where accommodations required the use of facial masking.

---

[7] FAR § 91.3 Responsibility and authority of the pilot in command. (a) the pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft.

## SECOND POLICY AND ENFORCEMENT

First the Plaintiff will address the second policy. On March 25, 2021, American and the union representing the pilots at American, the Allied Pilots Association (APA), signed Letter of Agreement 21-002 (LOA) titled Global COVID Pilot Vaccination/Testing/Protections. *See* Exhibit C. Although neither American nor APA is a health care provider, a health organization, or are in any way authorized to make health related decisions on behalf of the Plaintiff affecting his medical Certificate, they signed the LOA of March 25, 2021. LOA 21-002 addressed many operational issues however, toward the end of the second paragraph in the LOA, the parties to the LOA failed to include the regulation controlling such decisions, 14 CFR § 61.53[8]. 14 CFR § 61.53 is not only a footnote at the bottom of the vaccines table in the AME guide on page 400, *See* Exhibit B, it is also the main regulation delegating authority to the Plaintiff in health-related matters affecting his Certificate. At first glance, the LOA refers to Paragraph 2.g as being the only provision of the agreement to be considered an incentive for vaccination but upon further examination it becomes evident that the payouts overwhelm any incentive and replace it as they, in practical terms, become the incentive themselves. For example, under the LOA and because of the pilot schedule bidding system, a pilot could bid for two trips[9] worth $8000 or more and then schedule a vaccination in between creating conflict with the required 48-hour wait period after vaccination, and then do the same for the second dose of vaccination. There were other ways to "capitalize" on the agreement that pilots took advantage of but that was the one explained to the Plaintiff by one of his First Officers who did exactly that. In short, experimental vaccinations that were rushed to market were incentivized by American and the Plaintiff was coerced, under threat of termination, into accepting the medical treatment in violation of his Contract, primarily his authority in making health decision in accordance with the regulations and Public Policy. *See* Exhibit D. (Threat of termination by Defendant Long) The Plaintiff, with abundance of caution, investigated the effects of accepting such an experimental medical treatment and consulted FAA documentation for guidance. The Plaintiff also filed a report with the FAA Hotline Information System[10] (FHIS) on October 18,

---

[8] See medical certificates in exhibit B. The Plaintiff is directed to comply with 14 CFR § 61.53 under conditions of issue.
[9] A trip is a reference to an assignment consisting of at least two flight segments.
[10] FHIS is a web-based application used for tracking voluntary reports of unsafe or unauthorized aviation activities violating Federal law or FAA regulation related to aviation safety or practices.

2021, expressing concerns about the vaccination and their effects on his medical Certificate. (To date the Plaintiff has not received a response). *See* Exhibit B.  In an effort to investigate the vaccine and its effect on aviators, the Plaintiff conducted a short search in the Center for Disease Control (CDC) Vaccine Adverse Event Reporting System (VARES) and discovered issues of serious concern for aviators that are sometimes deadly. *See* Exhibit F.  In addition, messages from American managers, such as Defendant Long, were threatening and misleading causing confusion. *See* Exhibit D. The Plaintiff had genuine concerns about the vaccination and was seeking answers from Defendant Long, but Long did not provide any answers and, when asked by the Plaintiff during an appeal hearing conducted by Long on March 30, 2022, he blatantly refused to answer. *See* Exhibit E.

To sum it up, the Defendants intended on using everything at their disposal to induce the plaintiff to accept the experimental medical treatment and amend his employment Contract against his wishes. The Defendants employed coercion by threatening termination of employment and by using evasive communication methods and half-truths, incentivized experimental vaccination drugs and disregarded the Plaintiff's statutory authority and obligations under the regulations and Public Policy relating to health decisions affecting his medical Certificate, and more importantly left out any meaningful discussion of the effects of the drugs on a pilot's health and medical Certificate. Even if the Plaintiff were to request an accommodation, as American titled the process of exemptions if one should seek an exemption, the conditions of accommodations imposed would have been in line with American's other mandatory policy, the facial masking of the Plaintiff.  The Plaintiff rejected American's policy for it is his determination it interfered in his ability to comply with the FARs and is in violation of Public Policy.  AA's demand is an amendment to the employment Contract that the Plaintiff rejected.

## FIRST POLICY AND ENFORECEMNT

Next the Plaintiff will address the first policy which has as profound an effect on the Plaintiff's employment Contract as the second policy.

In or around January 2020, and prior to any government mask order, American created a facial mask policy[11]. American enforced the masking of pilots and continued to do so after the issuance of an exemption contained in the federal mask mandate. *See* Montgomery declaration and Exhibit D. Facial masking is a procedure that interferes with the standards of issuance of an FAA medical certificate and the FAA has not amended the regulations or the medical standards to allow for facial masking. The American face mask policy also constitutes a breach to the terms of the employment Contract between the Plaintiff and American, primarily the FAA medical Certificate, impacting Public Policy. Here again, under threat of termination, American breached and demanded new employment Contract terms and conditions, an amendment, relating to the Plaintiff's FAA medical Certificate. The Plaintiff refused to amend his employment Contract. Health decisions the Plaintiff makes to maintain a valid FAA medical Certificate are not negotiable and there are no agreed to terms for work rules or work conditions in the JCBA addressing the practice. Since the Plaintiff refused to amend the contract and the JCBA did not contain any agreement addressing masking of pilots, American resorted to other measure in forcing the Plaintiff to comply and accept the terms of an amendment. To sustain the employment Contract breach and after a mask incident on December 6, 2021, at the Spokane International Airport, American resorted to disciplining the Plaintiff by implementing Section 21[12] of the JCBA and demanding the Plaintiff accept the Contract amendment or face possible termination.

First American removed Ken Wood, the Plaintiff's former chief pilot who agreed with the Plaintiff's interpretation of the mask order and regulations (Doc. 1 at 18 and 19) American then wrongfully invoked a JCBA Section 21 disciplinary action. *See Hawaiian v. Norris* 512 U.S. 246 (1994) at 256, 57, "Moreover, we have held that the RLA's mechanism for resolving minor disputes does not pre-empt causes of action to enforce rights that are independent of the CBA. More than 60 years ago, the Court rejected a railroad's argument that the existence of the RLA arbitration scheme preempted a state statute regulating the number of workers required to operate certain equipment. *Missouri Pacific R. Co. v. Norwood*, 283 U.S. 249, 258 (1931). As Plaintiff stated, his medical

---

[11] Plaintiff did not have a disagreement with the federal mask policy. In accordance with 49 U.S. Code § 114 (g)(2) and the FARs, the federal mask policy contained an exemption for pilots and the Plaintiff simply complied with the exemption and the law.

[12] Section 21 is titled Discipline, Grievances, Hearings and Appeals in the JCBA.

1 Certificate is not negotiable or is part of any term in the JCBA, rather it is a right and obligation under
2 the statute. The Defendants abused the process to achieve their goal.

3     The Defendants understood very clearly on January 6, 2022, that the Plaintiff is not willing to
4 amend the employment Contract with American or is willing to violate the FARs. The Plaintiff will
5 not sign any fitness for duty declaration, as required by law, when he knows and has a reason to know
6 of the existence of any deficiency no matter how minute and whether imposed, demanded, created or
7 otherwise, that would render him unable to meet the standards of issue of his medical Certificate under
8 14 CFR Part 67. The Plaintiff articulated his position carefully during the hearing conducted by
9 Defendant Raynor on January 6, 2022. (Doc. 30 Exhibit 1 at 20) Because of the position the Plaintiff
10 took and for his refusal to amend his Contract or violate regulations he is being punished, threatened
11 with termination, and is being retaliated against. American cannot have it both ways, dictate to the
12 Plaintiff health decisions and enjoy the benefits of fitness for duty statements the Plaintiff must make
13 under the law.

14

15                         **HOSTILE WORK ENVIORNMENT**

16     The Plaintiff is experiencing a hostile work environment at American Airlines and feels he is
17 being targeted for refusing to accept an amendment to his employment contract. After 24 years of
18 impeccable service, he is being disciplined, threatened with termination, suspended without pay and
19 retaliated against up to and including subjecting him to a fitness for duty examination without cause.
20 The Plaintiff has been denied the ability to participate in lucrative flying, and he and his dependents
21 denied travel benefits. The Plaintiff is being singled out.

22     Following the event on December 6, 2021, at the Spokane International Airport, and after
23 removing former chief pilot Ken Wood from any active participation wrongfully issued a Section 21
24 disciplinary hearing letter to Plaintiff. Defendant Raynor, who is based at the AA Chicago pilot base,
25 took over for Ken Wood and on January 6, 2022, traveled to Arizona to conduct the hearing. This
26 Court has determined it has personal jurisdiction over Defendant Raynor. *See* Doc. 32. Under threat
27 of termination, the Plaintiff participated in the hearing. Prior to Ken Wood removal, the Plaintiff had
28 the following discussion with him. Ken told the plaintiff: "Washington State is coming after you,

what have you done?" The plaintiff asked if Ken remembered 14 CFR § 61.53 and if he knew that there is an exemption in the Security Directive (SD) issued by the TSA and Ken responded that he did not. The plaintiff provided the reference and Ken responded in a text message after looking it up in the following: "I found FAR 61-53 a, b. Which per of the CDC was it. I wrote down CDC order footnote 7?" Ken informed the plaintiff that he was asked by his manager to give the plaintiff a "directive" and that Ken's own manager (the plaintiff alleges the manger is the Senior Vice President of Flight Operations Chip Long based in AA Dallas hub) told him "If the plaintiff did not comply, we got him on insubordination" but Ken, not knowing the law and the fact that he knew the plaintiff for years and knew of his impeccable record, was not about to do it and did not. (Doc. 30 Exhibit # 11) The Defendants had a clear intent on December 6, 2021, to terminate the Plaintiff's employment Contract.

Defendant Raynor is domiciled in AA's Chicago pilot base and supervises both Chicago and Phoenix pilots. On January 6, 2022, he flew to Phoenix, Arizona to conduct a disciplinary hearing of the Plaintiff. Defendant Raynor, a captain himself, is aware of the federal regulations and he is under an identical term of employment as the Plaintiff. In contradiction to the rules and regulations, Defendant Raynor willfully conducted the hearing to discipline the Plaintiff and coerce him into accepting an amendment to his Contract. A review of the hearing transcript (Doc. 30 Exhibit #1) shows that, on multiple occasions, during the hearing Defendant Raynor threatened the Plaintiff with unknown outcomes and consequences up to and including termination. Defendant Raynor stated that he had the power to keep the Plaintiff from getting his hands on AA's airplanes or place him on leave without pay. (Later to be accomplished by Defendant Naumann) Defendant Raynor was merely informing the Plaintiff of AA's intentions moving forward. It was a matter of execution. Ken Wood had already informed the Plaintiff of AA's intension of terminating him by and through fabricated insubordination on December 6, 2021.

When asked, Defendant Raynor stated that in no way he would do anything to jeopardize his medical Certificate. He also stated that the reason for wanting the Plaintiff to wear a mask is because the Plaintiff is in a leadership position and AA needed him to do so to project a certain image so crew and passengers alike would follow, regardless of how it affects the pilot's medical standards. The

Plaintiff offered Defendant Raynor authority over his medical Certificate if AA could show they have jurisdiction or authority, and if that were the case the Plaintiff would do anything AA asks of him to do but AA would have to sign a fitness for duty statement on the Plaintiff's behalf. (Doc. 30 Exhibit #1). Defendant Raynor replied in the negative indicating AA cannot do that, AA simply does not have that authority.

The Plaintiff rejected AA's medical treatment policy and did not request any accommodations, and in accordance with his employment Contract, he did not feel he needed to. American has since been consistent in their punishing approach of the Plaintiff. When the Plaintiff felt he was being discriminated against and that there may be a repeat of past discrimination, he expressed such concerns to his managers by providing documentation in support of his claim. The Plaintiff experienced discrimination at the airline in the past and felt that he was being discriminated against and when he brought it to the attention of his managers, American doubled down and immediately retaliated by demanding a fitness for duty examination. *See* exhibit D. American, through the current Phoenix chief pilot Defendant Devereux-Naumann, continues the retaliation against the Plaintiff, a Captain of impeccable 24-year record with the airline, by continued suspension without pay as of August 22, 2022, by Defendant Devereux-Naumann and by demanding a fitness for duty examination without cause under threat of termination. American doubled down and without hesitation, in violation of yet another agreement struck between the parties, (Anti-discrimination agreement with America West Airlines) and in retaliation continues demanding a fitness for duty examination by Defendant Devereux-Naumann without giving the Plaintiff the reason for the examination. If Defendant Devereux-Naumann signs a directive for an examination, then she sure must know the reason, but she refuses to divulge it to the Plaintiff and insists on him visiting the forensic psychiatrist. In addition, and since there was no response from HR for the Plaintiff's discrimination complaint, Plaintiff wrote a letter to American SVP Chief Legal Officer complaining about discrimination with reference to the America West Airlines agreement. Exhibit D. The response came from the HR employment office but did not address the Plaintiff's discrimination concerns and denied the existence of discrimination without even communicating with the Plaintiff to understand his concerns or investigate such concerns.

To date, since April 22, 2022, no reason for the fitness for duty examination has been given. Doc. 35 Exhibit 8.  Initially American communicated with a Dr. Barton, made hotel reservation for the Plaintiff in Chicago (no doctor appointment was made) for May 9, 2022, and then cancelled. American then waited and made an appointment with a forensic psychiatrist in San Francisco for July 8, 2022, 76 days after the April 22, 2022, notification. The Plaintiff did not keep the appointment. (Plaintiff filed for relief with the Court and was denied) Then current Phoenix base chief pilot Defendant Devereux-Naumann took the helm and scheduled another appointment with the same forensic psychiatrist for August 12, 2022, right in the middle of the Plaintiff's vacation, (Vacation is scheduled a year in advance) later to claim she did not realize the Plaintiff had a scheduled vacation. The event caused extreme stress for the Plaintiff and family ruining their vacation. Defendant Devereux-Naumann then scheduled a third appointment with the same forensic psychiatrist for August 19, 2022. The Plaintiff reported sick on August 18, 2022, which was followed by two more weeks of vacation, and remained on sick leave. Defendant Devereux-Naumann then issued yet another letter of investigation, or a Section 21 letter, for failure to show for the August 19, 2022, appointment and placed the Plaintiff on unpaid leave in complete disregard and rejection of the fact that the Plaintiff was on sick leave. Defendant Devereux-Naumann demanded appearance for the hearing on October 13, 2022.  In the meantime, Defendant Devereux-Naumann suspended the Plaintiff's pay (did not issue the August 15, 2022, paycheck) A few days later when questioned by the Plaintiff, Defendant Devereux-Naumann claimed a technical problem with payroll after which a paycheck was issued. The Plaintiff has never missed a paycheck in 24 years. (Because of the Plaintiff status of administrative leave, it is the chief pilot office that submits the hours to payroll to generate a paycheck) On September 1, 2022, the Plaintiff obtained a new valid FAA issued medical Certificate[13] and updated American Airlines system as required. *See* Exhibit B. The Plaintiff is a long-time patient of Dr. Ross who has rendered his opinion of the Plaintiff's mental and physical state in a letter dated April 25, 2022. Plaintiff alleges that Defendant Devereux-Naumann is engaged in a retaliatory campaign against the Plaintiff.  Defendant Devereux-Naumann could not possibly be ignorant of the reasons for signing a document, a directive, ordering the Plaintiff to appear for a psychiatric evaluation by a forensic

---

[13] Examination for FAA issued medical certificate includes mental evaluation by the FAA medical examiner.

psychiatrist. Whether Defendant Devereux-Naumann knows the reasons for the fitness for duty demand or not, she is refusing to inform the Plaintiff of the reasons and it is the Plaintiff's allegation that she is willfully and without cause engaged in a retaliatory behavior against the Plaintiff. The Plaintiff also alleges that it is inconceivable that Defendant Devereux-Naumann would make several clerical errors such as causing him to miss his August 15 pay or scheduling company business for the Plaintiff during his vacation or after his notification of his sick status just to then notify him of his suspension without pay. The Plaintiff is entitled to sick pay and Defendant Devereux-Naumann suspended his sick pay without cause. Defendant Devereux-Naumann rejected the Plaintiff's sick notification. The Plaintiff alleges Defendant Devereux-Naumann's activity is willful, retaliatory, and calculated to cause maximum harm to the Plaintiff.

Not responding to the Plaintiff's concerns of discrimination, interrupting, and suspending his pay, scheduling him for company business during his vacation, disregarding his sick call and demanding appearance for company business can hardly be attributed to clerical errors or normal course of business. The Plaintiff is being targeted by the Defendants and he can only conclude that every one of Defendants actions is calculated to exert maximum pressure to force the Plaintiff into submission and surrendering his authority over his medical Certificate. The Plaintiff has been ready and available for American since December 6, 2021, and has had three FAA medical exams attesting to his physical and mental state. American is retaliating and has created a hostile work environment for the Plaintiff.


**DEFENDANT CHIP LONG'S ROLE**

*See* Exhibit E for discussion below. *Aries v. Palmer Johnson, Inc.,* 153 Ariz. 250, 735 P.2d 1373 (App. 1987); *Powder Horn Nursery, Inc. v. Soil & Plant Laboratory, Inc.,* 20 Ariz. APP. 517, 514 P.2d 270 (1973). A defendant's physical presence in Arizona is not required to establish personal jurisdiction. "When the defendant has purposefully directed his activities at the residents of the forum state, he cannot avoid jurisdiction merely because he did not physically enter the state, …" On March 30, 2022, Defendant Long remotely and willfully conducted, by electronic means, an appeal hearing of the Plaintiff. (Declaration of Chip Long Doc. 17)

On November 23, 2021, the Plaintiff sent an email to Defendant Long inquiring about the vaccination demanded by American. Defendant Long could not give the answer the Plaintiff was looking for and advised he would include others who possibly could. Then on December 13, 2022, after a TRO was issued by a Circuit Court, the Plaintiff inquired about the status of AA demand for vaccination. In his same day response, Defendant Long broached the subject of masking and asked the Plaintiff if mask compliance is an issue for the Plaintiff. The Plaintiff did not intend on discussing masking, it was Defendant Long who initiated the discussion with intent. Defendant Long's question was in reference to the incident of December 6, 2021. Defendant Long had the purpose and intent of becoming involved in any future proceedings.

Defendant Long willfully accepted[14] a position of Vice-President of Flight at American and as such and in accordance with the JCBA he is expected to hold Appeal Grievance Hearings throughout the American Airlines system or designate a representative in his place. By doing so, Defendant Long himself created contacts with many forum States and in this case Arizona. Defendant Long's activities as SVP of Flight are very well laid out and organized. They are not random, fortuitous, or attenuated, they are in waiting for an event that causes Defendant Long to act, in this case the Plaintiff's appeal hearing, a result of wrongfully using a disciplinary process. On March 30, 2022, defendant Long's activity was directed at Arizona via video conferencing. *Id. Aries v. Palmer Johnson, Inc.* Defendant Long had not been in that position long enough to account for too many business trips to Arizona (especially during the COVID era) and claims he was involved in a single hearing related to the Plaintiff. (Doc. 17) However, "it is not the number of contacts involved but the importance of the particular contact. Quality, not quantity of defendant's activities is what is persuasive." *Meyers,* 143 Ariz. At 253, 693 P.2d at 908. Therefore, a single act is sufficient to establish a basis for personal jurisdiction. Here, the court must consider the gravity of the activity. Defendant Long, a pilot himself, knows all too well that health related decisions are vested in the pilots themselves by the FAA, therefore he intentionally acted to hold the appeal hearing alongside the Managing Director of Line

---

[14] Black's Law 5th edition. Accept, means something more than to receive, meaning to adopt, to agree to carry out provisions, to keep and retain.

Operations Captain Russ Moor and Director of Line Operations Captain Jeff Price and deny the Plaintiff the grievance. Exhibit E.

In sum, Defendant Long, knowing the rules and regulations and Public Policy, intentionally directed his activity at the forum State when he held the appeal hearing on March 30, 2022, and by questioning the Plaintiff in an email over American's mask policy, he had every intention of becoming active in the process of violating the Plaintiff's Contract and force an amendment. Defendant Long used a well-oiled machine that he willfully accepted to be part of to accomplish his objective. Defendant Long could have designated a representative to hold the hearing but he chose to conduct it himself. In addition, during the hearing Defendant Long refused to answer the Plaintiff's question related to the J&J vaccine.

## MOOTNES ARGUMENT

Defendants have previously put forward a mootness argument. Plaintiff will address mootness in the event the Defendants bring the same argument forward.

There are exceptions to the mootness doctrine. Perhaps the most notable exception applies when the case involves circumstances that exist only for a short, fixed time and that may be over by the time the litigation reaches the Supreme Court.

The Supreme Court has carved out an exemption for cases that are "capable of repetition, yet evading review." In other words, if the issues may arise again and will often or always face timing challenges, the federal courts should not dismiss such cases for mootness and may continue to hear the litigation. The famous case of *Roe v Wade* illustrates one exception to the mootness rule. In that case, the Court considered Jane Roe's challenge to a Texas abortion law long after her pregnancy had ended. The Court said that if an important right is denied, as is the case here, and the application of the mootness rule mean that the denial of that right –though likely to continue—would escape judicial review, the Court has jurisdiction to consider the case and, if appropriate, vindicate the right in question. In this case it is the right and obligation under federal regulations that the Plaintiff and only the Plaintiff can make health related decisions affecting the validity of his FAA medical Certificate.

The Defendants have stated that "…American updated its policies to bring them into alignment with the TSA directives…" (Doc. 19) and again "…On February 1, 2021, American announced updated mask policies to align with TSA Security Directives." (Doc. 16 at 4) American created a mask policy well before the mask mandate was issued. American's mask policy, which included the masking of pilots, changed very little with the TSA security directive (SD) even though the SD contained an exemption targeting pilots. The Defendants contend they have the authority to create a policy to mask pilots, and they may very well bring that policy back at any day of their choosing.

During the hearing conducted on January 6, 2022, Defendant Raynor contradicted the Montgomery declaration by stating that "…We have a policy here. I didn't make it up. Our CEO didn't make it up. Ken and I have nothing to do with the federal mandate, the local mandate, the state mandate, which is a law…"

Later during a grievance hearing conducted by Defendant Raynor on February 28, 2022, he stated "…It is the Company's position that it is not only within American Airline's authority to require its employees to wear face masks in airports, but also that federal law requires…" The federal law the Defendant was referring to is the masking requirement-commonly known as the Mask Mandate-a Centers for Disease Control and Prevention regulation published in the Federal Register on February 3, 2021.

In conclusion, 1) American created a mask policy requiring the masking of pilots well before the mask mandate was issued. 2) American claims to have the authority to create a policy of masking pilots. 3) There is no reason to believe that American would not reinstate that policy again in the future. 4) On May 31, 2022, the U.S. DOJ filed an appeal with the 11th Circuit Court to overturn the Order issued on April 18, 2022, declaring the mandate unlawful,[15] and 5) Enforcing masking of the Plaintiff is a violation of a Contract in place between him and Defendant AA and a violation of Public Policy. For the above reasons and because Plaintiff has authority over health decisions relating to his FAA medical Certificate in accordance with the federal regulations, the court must follow the exception that the Supreme Court has carved out and not entertain any arguments in favor of mootness.

---

[15] See Order in Health Freedom Defense Fund, Inc., Ana Carolina Daza, and Sarah Pope, v. Joseph R. Biden, Jr. (Case No: 8:21-cv-1693-KKM-AEP.

## DEFENDANTS AS STATE ACTORS

Upon arrival in Dallas on the morning of December 6, 2021, and during conversations with the Plaintiff's former chief pilot at the time, Ken Wood, some things were made clear 1) In a text message, the chief pilot concurred with the Plaintiff that the language of the CDC order and the federal aviation regulations agree under the exemption. 2) The chief pilot told the Plaintiff that he would make some calls to resolve the matter. 3) The chief pilot informed the plaintiff that he was ordered by his superior to give the Plaintiff a "directive" and if the Plaintiff did not comply "[w]e got him on insubordination," Ken did not issue a directive. 4) Chief pilot Ken was promptly removed from any active participation in any of the proceedings and was replaced by Defendant Raynor. On December 6, 2021, the Defendants interests and that of the police officers at the Spokane International Airport aligned, that is enforce the facial masking on Plaintiff at any cost and protect the travel service provided by the airline. A private party can be "fairly said to be a state actor for purposes of Section 1983 under four tests. Under the "close nexus" test a private party can be fairly said to be a state actor where "there is a sufficiently close nexus between the state and the challenges action of the [private] entity so that the action of the latter may fairly be treated as that of the state itself." *Blum v. Yaretsky* 457 U.S. 991, 1004, 102 S.CT. 2777, 73 L.Ed.2d 534 (1982). Here, neither the police nor the Defendants had any legal ground to enforce masking on the Plaintiff. The Plaintiff has an employment Contract with Defendant AA giving him full authority over his medical Certificate and an exemption in the SD issued by the TSA accomplishing the same. The police elected to pursue the Plaintiff and further made sure that punishment through AA would continue and would come swiftly. The police did not merely notify AA of the event but rather made certain the Plaintiff was delt with by AA by following up with more information in their pursuit. *See* Exhibit G and Doc. 30 Exhibit #1. The police did not only notify Tony, the AA gate agent on duty on December 6, 2021, but went further on and communicated the event to higher authority. The police were informed by the gate agent that the Plaintiff's former chief pilot would be contacted, but that did not stop the police fostering a closer

nexus with AA. AA on the other hand reciprocated and unnecessarily invoked disciplinary[16] measures. The Plaintiff was in full compliance with the rules and the law and the TSA SD.

If the government merely acquiesces in the performance of an act by a private individual or organization it is not state action, but if the government coerces, influences, or encourages the performance of the act, it is state action, *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) or the compulsion test. The police at the Spokane International Airport not only acquiesced to the defendants in favor of an on-time departure of a flight commanded by the plaintiff, but also created sufficient contact with the defendants and offered assistance and encouragement in the persecution of the plaintiff. *See* Exhibit G. The Police compelled the Defendants to pursue the Plaintiff. The police profiled the Plaintiff and the police report that was offered to AA by the Spokane Airport police, *see* exhibit G, referenced the plaintiff as a Middle Eastern individual under race and Plaintiff contends that racial profiling by the police was passed on to AA. The defendants and the police had a "symbiotic relationship". The police did not apply the exemption in the SD or escort the plaintiff out of the airport as directed by the SD but rather unlawfully detained him for 10 to 15 minutes and only released him in favor of an on-time departure. Plaintiff asserts the police were in violation of the Plaintiff Fourteenth Amendment rights and that the violation continued by the Defendants. Under the "symbiotic relationship" test, a private party can be fairly said to be a state actor where "the state has so far insinuated into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity" *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.CT. 856, 6 L.Ed.2d 45 (1961) the Defendants jointly with the Spokane police carried on with what the police had started, a benefit the police were intending on receiving, lawfully or unlawfully is immaterial here, they intended on forcing the Plaintiff to use facial masking. *See* exhibit G. A successful persecution of the Plaintiff assures the Spokane police of the Plaintiff's compliance next time he operated out of Spokane airport.

A private party can be fairly said to be a state actor where a private party is a "willful participant in joint action with the State or its agents." *Lugar,* 457 U.S. at 941, 102 S.Ct. 2744 (1982) The

---

[16] Blacks law 6th edition. Discipline. Instruction, comprehending the communication of knowledge and training to observe and act in accordance with rules and orders. Correction, chastisement, punishment, penalty. To bring order upon or bring under control.

defendants willfully participated in punishing the Plaintiff knowing, as pilots themselves and as an airline, that only the pilot has the authority to make health decisions affecting his FAA medical Certificate and if the pilot determines he/she is fit for duty in that moment, the pilot can then make the fit for duty statement under 18 U.S. Code § 1001. Again, considering the defendants do not have authority over the plaintiffs FAA issued medical Certificate they accepted a delegated action by the Spokane police. Here again, whether the police authority was perceived or given is immaterial, what is true is the fact that the defendants were "delegated …a power traditionally exclusively reserved to the State" and by doing so they performed a public function. *See Terry v. Adams* 345 U.S. 461, 468-470, 73 S.CT. 809, 97 L.Ed. 1152 (1953) Neither the police nor AA have the legal authority to dictate health decisions to Plaintiff in the conduct of his duty under the FARs but AA's conduct, in contradiction to the employment Contract, must be viewed as a continuation of the police action and not a warranted employer disciplinary action. Considering the facts detailed above, the court must arrive at the conclusion that there was a sufficient close nexus between the state and the defendants, there was a symbiotic relationship, there was a joint action and finally police power was delegated to the defendants and only the defendants could have continued targeted police action against the plaintiff on AA property. For the foregoing reasons the plaintiff asserts the court must find the Defendants as state actors for the purpose of 42 U.S.C. Section 1983.

## VIOLATION OF AVIATION LAW

The plaintiff alleges that under the guidance and approval of captain Chip long, the senior VP of Flight Operations and the enforcement by Directors of Flight such as captain Timothy Raynor and others in similar positions, AA created mask policies haphazardly which placed pilots and crew and passengers in grave danger. The plaintiff alleges that AA dispatched certain flights manned by pilots who may have unwittingly violated the medical standards of their FAA issued medical certificate. Airline pilots must follow and do rely heavily on the airline operations manuals that guide them through their daily tasks. Safety is paramount and pilots must also follow **all** the FAA rules and regulations as written in FAA publications.

For example, contained in the AA manual is one very important FAA regulation related to medical conditions. The regulation was paraphrased resulting in a materially altered meaning of the rule. The stark difference between what AA published in the manual and the actual language of the rule cannot be ignored or underestimated. The source for the rule is the Federal Aviation Regulations (FARs). The specific rule is 14 CFR § 61.53 which in part states in paragraph (a) the following: "…..no person who holds a medical certificate issued under part 67 of this chapter may act as pilot in command, or in any other capacity as a required pilot flight crewmember, while that person: (1) ***Knows or has reason to know of any medical condition that would*** make the person unable to meet the requirements for the medical certificate necessary for the pilot operation….."

While AA references the above rule as the source, the manual paraphrases it to state the following: "***Do <u>not</u> report for duty or start a flight segment with a known medical deficiency that would not meet medical certificate requirements.***"

At the time the AA manual was published and approved by the airline FAA Principal Operations Inspector[17] (POI), no one envisioned pilots being forced to accept certain medical procedures or mask wearing. Again, the FAA has not amended or issued an exemption to the medical standards established under FAR Part 67 to reflect the use of masks by pilots and, even though the plaintiff brought it to captain Raynor's attention, AA did not address the reference 14 CFR § 61.53 to reflect and clarify the true meaning of the regulation.

Another AA created mask policy requiring pilots to wear masks during the Covid-19 pandemic bucked the safety mantra in aviation. For example, AA selectively created a policy which complied with the TSA SD containing the mask exemption for pilots. The AA policy, while for safety reasons dictated that pilots did not have to wear a mask on the flight deck, allowed pilots who wished to wear a mask to do so in potential violation of their medical certificate and the safety reasons cited for not wearing one. The policy, while materially reaffirms the fact that pilots are the final authority in decision making when complying with the standards of their medical certificates, encouraged those who wished to wear a mask to do so.

---

[17] POI is the liaison between commercial air carriers and the FAA

Another flawed policy required the pilot remaining on the flight deck to wear a mask when one pilot must leave the flight deck for physiological reasons. The plaintiff alleges that AA did not have any training program and has not trained pilots on the removal of facial masks and the donning of oxygen masks in events such as rapid decompression or smoke and fumes on the flight deck, both critical to the survival of the pilots and the safe outcome for crew and passengers. A single pilot on the flight deck at the controls wearing a facial mask places the entire ship, and crew and passengers in grave danger should such an event occur. The plaintiff himself has not received any such training and none was offered. American did not provide training as required under 14 CFR § 121.417 with the new condition, facial masking.

AA mask policy also required pilots to wear masks while deadheading[18]. The plaintiff alleges that this policy resulted in gross violations of the FARs. Pilots who wear a mask while deadheading for hours at cabin altitudes of several thousand feet create a huge medical deficiency and have no way of knowing if they meet the standards of their FAA issued medical certificate rendering them illegal while on duty and in violation of their signed fit for duty statements. Such a condition of possible violation was confirmed to the plaintiff by his AME.

Pilots who wear a mask in airport terminals for hours on end as they wait for their aircraft to arrive face the same outcome. Anecdotal evidence shows that pilots coped with the AA mask policies by "cheating", placing the mask below their nose or pretended to be drinking or eating. Those who were deadheading did not have that luxury for they were harassed by flight attendants and forced to wear masks. Flight attendants who are there for safety became the mask police.

The plaintiff at one point was contacted by a pilot who stated that he would carry an oximeter, and that by the time he arrived at the flight deck after a walk through the terminal, his oxygen levels would be low enough to qualify for supplemental oxygen. He would then use the oxygen mask available to pilots on the flight deck for emergencies to bring his oxygen levels up before signing fit for duty for the flight. Pilots should not be forced to extreme measures to comply with the medical standards of their medical certificates placing crew and passengers at risk.

---

[18] Deadheading is where a pilot is transported in the cabin to where said pilot can perform other duties for the airline or begin a new flight segment.

In addition, the plaintiff alleges that AA did not develop or provide training to pilots or flight attendants who performed duties on aircraft operating above altitudes of 25000 feet (flight level FL250) as required by the FARs with a facial mask on. Rule FAR § 121.417 requires airlines to provide training in emergency procedures for crewmembers who operate aircraft above FL250. Such training must include emergency procedures for decompression, respiration, hypoxia, and duration of consciousness without supplemental oxygen at altitudes. The plaintiff alleges that he received such training in the past, but since AA created their mask policies, he did not receive and was not offered any such training with a mask on.

Additionally, AA developed a Public Address (PA) announcement stating that masking was a federal law and directed the captains to mandatorily make such announcements during the boarding process. The plaintiff alleges that a law forcing passengers to wear a facial mask never existed and AA forced the captains to lie to the passengers in direct violation of AA's first rule of PA making which directs captains to never lie. At some point in November of 2021, AA corrected the PA announcement to reflect the true nature of the mandate but kept their website reference to a law unchanged. A passenger who wished to fly on AA was forced to agree to wearing a mask for the flight. The plaintiff alleges that AA placed the passengers in grave danger. In the case of a decompression, the passengers, who are already oxygen deficient because of mask wearing, would suffer harm and possible death during such an event no matter how rare the event may be. The passenger safety briefing and demonstration by the flight attendants did not visually demonstrate to the passengers the removal of the facial mask. Flight attendants demonstrated the use of oxygen with the facial mask on. The flight attendants would then make a last-minute announcement to remind the passengers to take the facial mask off first.

The Plaintiff communicated his concerns to the FAA. *See* Exhibit B. On October 18, 2021, the Plaintiff communicated his concerns to Mr. Stephen Horner in the FAA western region office who forwarded the Plaintiff's concerns to Dr. Lomingino in the Federal Air Surgeon's office. The Plaintiff listed 20 questions for the office and to date there has been no answer given. Then Plaintiff filled a complaint with the FAA's FHIS office regarding the demands of AA and the concerns he has related to his medical Certificate. Plaintiff still has not received a response. Another concern the Plaintiff

had and there was no response from AA was the J&J vaccination, which was suspended by the FAA, but AA kept it as an acceptable vaccination for their Contract amendment demand. *Id.* On October 29, 2021, the Plaintiff communicated with the office of the FAA chief counsel for language clarification related to 14 CFR § 61.53.  The answer came on August 29, 2022, indicating the language does not raise a novel issue requiring interpretation and forwarded the request to the Office of Safety Standards. No response so far. The rule is clear, but the Plaintiff wanted direction from the FAA.

The Plaintiff then contacted captain Steven Dickson, the FAA administrator at the time, following the incident of December 6, 2021, who forwarded his letter to the FAA Aeromedical Chief. What the Plaintiff received was a letter from the FAA Federal Air Surgeon dated January 5, 2022, the response did not contain any legal guidance or a factual position by the FAA.  The response contained a political response in contradiction to the mission of the agency.  The Plaintiff did respond to the Federal Air Surgeon in a letter dated January 23, 2022.  In a last attempt to get the FAA to act, on February 25, 2022, the Plaintiff communicated again with the FAA administrator just before his retirement asking him to act in favor of aviation safety but received no response.

It is clear to the Plaintiff the FAA is nonresponsive and unwilling to uphold its mission of aviation safety.  Plaintiff alleges that AA is complicit in its departure from the mission of flight safety and has been empowered by the FAA's silence in disregarding the Plaintiff's authority over health decisions he makes in maintaining a valid FAA issued medical Certificate and in their demand for an amendment to the Contract to gain control over Plaintiff's health decisions

**IN CONCLUSION**

Plaintiff entered into an employment Contract with Defendant American Airlines on November 3, 1997.  The pertinent term of the employment Contract in this dispute is the Plaintiff's FAA issued medical Certificate and his authority over health decisions he makes. The Contract states the Plaintiff is to comply with Public Policy and maintain said medical certificate. Under penalty of law, Public Policy dictates and vests authority in the Plaintiff, and only the Plaintiff, in making health decisions directly related to maintaining the standards of issuance of such medical Certificate. American Airlines and the remaining Defendants instituted a mandatory facial masking and

vaccination policy in violation of the employment Contract and Public Policy. Plaintiff rejected the policy and refused to amend the employment Contract. Defendants subjected the Plaintiff to disciplinary measures including suspension from flight, suspension of pay and JCBA benefits and retaliated by demanding a fitness for duty assessment despite the fact Plaintiff supplied American with the required FAA medical Certificate as the employment Contract stipulates.  Plaintiff has been ready for duty since December 6, 2021, but American refuses to reinstate him to flight status under the terms of the Contract.  The Defendants are in breach of the employment Contract and in violation of Public Policy.  The Defendants have caused great harm to the Plaintiff.

### PRAYER FOR RELIEF AND REMEDY

WHERFORE, Plaintiff respectfully requests the Court enter the following judgement and relief:

- American Airlines reinstate the Plaintiff to flight status immediately.

- Expunge the Plaintiff's employee file of any reference to insubordination or violation of any company policy.

- Order the Defendants to cease demanding the Plaintiff comply with the mandatory facial mask or vaccination policy and declare such company policies in violation of the employment Contract and Public Policy.

- Replenish the Plaintiff's sick bank hours to the level prior to December 6, 2021.

- Award Plaintiff compensatory damages in the amount of $250.000,00 plus 16 per cent (16%) or higher with passage of time.

1
2      -    Issue judgment in Plaintiff's favor on causes of action alleged herein pursuant to 42 U.S. Code
3           § 1983
4
5      -    Award Plaintiff punitive damages of $33.300.000,00 or higher amounts as the court sees fit.
6
7      -    Award Plaintiff reasonable costs and attorney fees, if retained, pursuant to 42 U.S. Code §
8           1988; and,
9
10     -    Grant Plaintiff other and further legal and equitable relief as the Court deems just and proper.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JURY DEMAND**

NOW COME Plaintiff, Pro Se, and hereby demands trial by Jury of the above-referenced causes of action.

Dated this 25th day of October 2022.

Bahig Saliba

10824 E Santa Fe Trail

Scottsdale, AZ  85262

Tel. 480-235-0304

Email: medoverlook@protonmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this day October 25, 2022, I electronically transmitted the forgoing with the Clerk of the court using the CM/ECF system for filing, with copies submitted electronically to the following recipient:

Lisa Anne Smith (AZ #16762)            Molly Gable (WSBA # 47023)

Deconcini McdonaldYetwin &Lacy, P.C.   Seyfarth Shaw LLP

2525 East Broadway Blvd., Suite 200.   999 Third Ave. Suite 4700

Tucson, AZ  85716-5300                 Seattle, WA  98104-4041

520-322-5000                           206-946-4910

LASMITH@DMYL.COM                       mgabel@seyfarth.com

                                       Nicholas Gillard-Byers (WSBA # 45707)

                                       Ngillard-byers@seyfarth.com

By

Bahig Saliba